IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION


RUSSELL T. NEAL,
      Plaintiff,

vs.                                                    Case No. 3:06cv17/MCR/EMT

OFFICER BOLTON and
DOCTOR HART,
      Defendants.
_____/

## THIRD REPORT AND RECOMMENDATION

This case filed pursuant to 42 U.S.C. § 1983 is now before the court upon referral from the clerk.  On March 29, 2007, the pro se Plaintiff, a state prisoner who is proceeding in forma pauperis in this action, filed a Fourth Amended Complaint (Doc. 22).  Plaintiff alleged that Dr. Hart, "Nurse Jane Doe AM," and "Nurse Jane Doe PM" deprived him of necessary medical care, and Officer Bolton used excessive force against him, all in violation of the Eighth Amendment.  On May 2, 2007, the court dismissed Plaintiff's claims against the unidentified nurses pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii), specifically, their alleged failure to provide treatment for his glaucoma, delay of a few days in providing eye drops that were prescribed by a specialist in August of 2003, and failure to provide prescription eyeglasses (Docs. 23, 24).  The court directed service of the complaint on Officer Bolton and Dr. Hart.  On February 4, 2008, Defendant Bolton filed a special report and supporting documents, and on March 14, 2008, he supplemented the report with an additional affidavit (Docs. 52, 54).  On March 18, 2008, Dr. Hart filed a special report and supporting documents (Doc. 55).  Plaintiff did not respond to the special reports.  On August 12, 2008, the court entered an order advising the parties of the importance and ramifications of Rule 56 summary judgment consideration, informing the parties of the requirements of materials that may be considered on summary judgment, and informing the parties that the special reports would be

construed as motions for summary judgment as of August 12, 2008, and taken under advisement on or after September 11, 2008 (Doc. 65).  Plaintiff filed a response to the summary judgment motions and supporting documents (Doc. 70).  Defendants have not filed additional argument or Rule 56 materials.

Upon review of the summary judgment record, it is the opinion of the undersigned that Dr. Hart's motion for summary judgment should be granted in part.  The motion should be granted as to Plaintiff's claims that Dr. Hart failed to provide treatment for glaucoma in Plaintiff's left eye, failed to provide eye drops for his right eye after August 7, 2003, and failed to provide laser surgery for his right eye, in violation of the Eighth Amendment.  Dr. Hart's motion should be denied as to Plaintiff's claims that Dr. Hart unreasonably delayed providing eye drops for Plaintiff's right eye and consultation with an opthalmologist until August 7, 2003, and failed to provide prescription glasses, in violation of the Eighth Amendment.  As to Officer Bolton, it is the opinion of the undersigned that his motion for summary judgment should be denied.  Finally, to the extent Plaintiff asserts an equal protection claim, his claim should be dismissed for failure to state a claim upon which relief may be granted.

I.     BACKGROUND

Plaintiff alleges the following facts in his Fourth Amended Complaint.  Plaintiff was incarcerated at the Okaloosa County Detention Center ("the Jail") at the time of the events giving rise to this complaint.  In Plaintiff's verified Fourth Amended Complaint, he alleges he was incarcerated at the Jail from April 30, 2003 through January 28, 2004 (Doc. 22, Statement Facts ¶ 1). He had several pre-diagnosed medical problems prior to his incarceration, and he informed medical staff of those problems at an initial intake pre-screening within the first two (2) weeks of his incarceration (*id.*, ¶¶ 2–4, 7).  With regard to Plaintiff's medical problems with his eyes, Plaintiff informed staff that in August of 2002, Dr. Shawn Hamilton, a doctor with the Hamilton Eye Institute, diagnosed him with glaucoma (*id.*, ¶ 8).  Plaintiff advised staff that he had laser surgery on his left eye and needed surgery on his right eye (*id.*).  Plaintiff "listed prescribed medications," including prescription eye drops, Cosopt, and Pilocarpine (*id.*).

Plaintiff was subsequently seen by Dr. Hart.  (*id.*, ¶ 11).  Plaintiff informed Dr. Hart of his medical needs, and Plaintiff told Dr. Hart that the Jail did not possess the necessary equipment to

monitor and treat his glaucoma, and that he required surgery for his right eye (*id.* ¶ 12).  From Plaintiff's description of the eye drops that had been previously prescribed, Dr. Hart was able to identify one of prescriptions (*id.*, ¶ 13).  Dr. Hart assured Plaintiff that he would receive the medication and medical care required for his glaucoma and other medical needs (*id.*, ¶ 14).

Plaintiff states that during the months of May through July of 2003, he complained twice a day to the nurses who dispensed medication in the cell block that he was suffering excruciating pain in his right eye, losing his vision, and feared he would go blind (*id.*, ¶¶ 15, 17, 19, 20, 26).  Plaintiff told "medical and correctional staff" that he required examination by a specialist and surgery in his right eye (*id.*, ¶¶ 21–22).  Plaintiff states that nurses took notes each shift, but an appointment with a specialist or eye drops were not provided (*id.*, ¶ 26).  Plaintiff used ice packs, which were provided to him to relieve a "viral disease" and to relieve the pain in his right eye, but he hid his use of the ice packs on his eye for fear that the ice packs would be discontinued (*id.*, ¶ 25).

Plaintiff additionally states that his prescription eyeglasses were taken from him by the Sheriff's Department when he was booked into the Jail, and the glasses were not returned to him until August of 2004, after a state court ordered the Sheriff's Department to return them (*id.*, ¶ 23).  In the meantime, Plaintiff attempted to compensate for his lack of prescription glasses by wearing as many as three pairs of magnifying glasses, which he supplied himself (*id.*, ¶ 24).

On August 26, 2003, Plaintiff was taken to the Hamilton Eye Institute (*id.*, ¶ 27).  At the time of the visit, Plaintiff had vision in both eyes (*id.*).  The eye specialist prescribed corrective lenses and Pilocarpine eye drops, but neither were immediately provided to Plaintiff (*id.*, ¶¶ 27–28).  In the interim, Plaintiff's criminal defense attorney, Michael Weinstock, retrieved an expired bottle of Pilocarpine drops from Plaintiff's home and delivered it to the Jail, but Plaintiff did not receive them until three days later because Jail officials lost them (*id.*, ¶¶ 28–30).  Approximately 120 days elapsed between Plaintiff's arrival at the Jail on April 30, 2003, and his examination by the eye specialist and receipt of the Pilocarpine drops in August of 2003 (*id.*, ¶ 31).

While Plaintiff was housed in "E Pod," beginning June 13, 2003, he observed that officers were using hand-held laser targeting devices to project beams on inmates' faces and other body parts (*id.*, ¶¶ 16, 32).  Officer Auford, who is not a named Defendant, threatened Plaintiff that he would conduct laser surgery on Plaintiff's eye with one of the laser targeting devices (*id.*, ¶ 33).  In August

of 2003, Plaintiff observed Defendant Bolton shooting a laser targeting device at him from a doorway while Plaintiff was drying himself behind the shower wall in "E Pod" (*id.*, ¶¶ 34, 68). Plaintiff observed the beam moving across his upper body, across the shower wall, and back onto him, and then observed Defendant Bolton standing in the doorway laughing at him (*id.*). The beam of light struck Plaintiff in his right eye (*id.*, ¶ 35). Plaintiff alleges the beam burned a "Cheerio shaped" sore on the center of his retina, and scar tissue maintained that shape as it developed on his retina (*id.*, ¶¶ 36–38).

Upon leaving the Jail and entering the Florida Department of Corrections (FDOC) in January of 2004, Plaintiff's vision had deteriorated such that he could no longer see the eye chart without looking away and using his peripheral vision (*id.*, ¶ 39). Doctor Tugwell at Walton Correctional Institution was the first FDOC doctor to examine Plaintiff (*id.*, ¶ 40). Dr. Tugwell, an optometrist, observed the "Cheerio shaped" burn on Plaintiff's retina and observed that "no other macular degeneration was present" (*id.*). Plaintiff was referred to Dr. Schlofman, a retinal specialist, who declared Plaintiff's retina to be "shot out" (*id.*, ¶ 41). Plaintiff was also examined by Dr. Wolchuk, an opthalmologist, who observed the damage to Plaintiff's retina (*id.*, ¶ 43). Plaintiff's optic nerve was damaged during an alleged incident of excessive force in July of 2005, which is the subject of another lawsuit filed by Plaintiff; however, Plaintiff states the injury to his optic nerve is unrelated to the permanent and irreversible damage to Plaintiff's retina from the burn (*id.*, ¶¶ 43–44). Plaintiff states he returned to the Jail from January 24 to February 2, 2005 (nine days), for court proceedings, and "medical staff" again withheld his medication even though he had them in his possession when he was transported to the Jail (*id.*, ¶ 59). Plaintiff states he will likely return to the Jail again for court proceedings in the future (*id.*, ¶ 60).

Plaintiff states that as a result of Officer Bolton's conduct, he has suffered substantial and permanent damage to his retina and vision in his right eye (*id.*, ¶¶ 45, 47–49, 51, 54, 55). He states that the delay in receiving eye drops or corrective lenses or both caused an excessive increase in inner ocular pressure due to his glaucoma, thereby resulting in pain and suffering and permanent damage to his vision (*id.*, ¶¶ 46, 50, 54, 55).

Plaintiff claims that Dr. Hart failed to provide adequate medical care by delaying an appointment with a specialist so that Plaintiff's eye pressure could be monitored and treated, failing

to provide prescription glasses and eye drops, and failing to schedule laser surgery for his right eye, in violation of the Eighth Amendment (*id.*, ¶¶ 64–66, Statement of Claims).  He claims that Defendant Bolton endangered his health and safety and essentially assaulted him by targeting the laser beam at his right eye, in violation of the Eighth Amendment (*id.*, ¶¶ 67–73, Statement of claims).  Plaintiff also asserts Defendants violated "the rights of prisoners with disabilities" in violation of the Fourteenth Amendment (*id.*, Statement of Claims).  As relief, he seeks compensatory and punitive damages for pain and suffering, permanent disfigurement, physical disabilities, and future medical expenses should technology develop that would render his condition treatable (*id.*).  He also seeks an order enjoining the use of lasers at the Jail (*id.*).

Officer Bolton, in his motion for summary judgment, first contends that dismissal of Plaintiff's claim against him is warranted because Plaintiff failed to properly exhaust his administrative remedies (Doc. 52 at 9–11).  In support of this contention, Officer Bolton submitted a copy of the written policy of the Jail concerning the inmate grievance procedure, as well as a copy of an affidavit of Deputy Director P. Lawson, filed in <u>Horn v. Wallace, et al.</u>, Case No. 3:06cv108/LAC/EMT (Doc. 52, Exs. B, C).  Officer Bolton argues that although Plaintiff filed an initial grievance concerning Bolton's alleged use of excessive force, the grievance was untimely as the policy requires that it be filed within seven days of the incident, and Plaintiff's grievance was filed at least one year later (*id.*).  Officer Bolton further argues that even if the grievance was considered sufficient, Plaintiff failed to appeal to the next higher level of administrative review (*id.* at 10).

Officer Bolton additionally contends he is entitled to summary judgment because Plaintiff has failed to show that he was involved in the alleged incident of excessive force (Doc. 52 at 13).  In support of this contention, Officer Bolton submitted his affidavit which states he was not involved in any of the incidents described in the Fourth Amended Complaint (Doc. 54, Ex. E).  Officer Bolton states that he became aware of Plaintiff's allegations because they were the subject of an investigation by Captain C. Morasch (*id.*).  Officer Bolton submitted a copy of Captain Morasch's office memorandum to Paul Lawson, Operations Officer, in which Captain Morasch concluded that Plaintiff's allegations regarding officers' intentionally shining laser lights at inmates were not supported by any evidence (Doc. 52, Ex. A).  According to the memorandum, as part of his

investigation, Captain Morasch interviewed Lt. Tom McDougald, Officer Nikki Small, and Defendant Bolton, who all identified Officer Sam Jones as the officer who possessed a laser pointer while on duty for "C" shift (*id.*). Officer Bolton additionally contends Plaintiff has failed to show that his eye condition was caused by anything but naturally occurring conditions, as demonstrated by Plaintiff's medical records submitted by Officer Bolton in support of his motion for summary judgment (Doc. 52 at 14, Ex. D).[1]

Dr. Hart, in his motion for summary judgment, first contends that dismissal of Plaintiff's claim against him is warranted because Plaintiff failed to properly exhaust his administrative remedies (Doc. 55 at 7–10).  In support of this contention, Dr. Hart relies upon the same Jail policy submitted by Officer Bolton, as well as copies of four inmate grievances filed by Plaintiff (Doc. 55, Exs. A, C).  Dr. Hart argues that Plaintiff failed to comply with the grievance policy because his grievances did not specify that Dr. Hart denied him proper medical care or allege a specific incident of a denial of medical care, rather the grievances seemed to allege that Dr. Hart had a duty to schedule outside medical care for Plaintiff; therefore, Plaintiff's grievances were not sufficiently specific and were not filed within seven days of the date of any specific incident, as the policy requires (Doc. 55 at 9).  Furthermore, even if the grievances were deemed sufficiently specific to constitute initial grievances and were timely filed, Plaintiff failed to appeal to the next higher level of administrative review (*id.* at 9–10).

Dr. Hart additionally contends he is entitled to summary judgment because Plaintiff has failed to show that Dr. Hart was deliberately indifferent to his medical needs (Doc. 55 at 12–16). In support of this contention, Dr. Hart submitted copies of Plaintiff's medical records and copies of inmate grievances filed by Plaintiff (Doc. 55, Ex. B).  Dr. Hart argues that the medical records belie Plaintiff's allegations that he (Hart) deliberately deprived him of necessary treatment for his glaucoma.  The records submitted by Dr. Hart show that Plaintiff's initial inmate screening was performed by Officer Eddie Wells on May 1, 2003, the day after Plaintiff's arrest (Doc. 55, Ex. B, Inmate Screening).  Plaintiff complained of pain in his right shoulder (*id.*).  In response to the

---

[1]In their special reports, filed over seven months ago, Defendants state they are still collecting and analyzing Plaintiff's medical records and indicate that they may supplement their reports with additional evidence (*see* Doc. 52 at 14–15; Doc. 55 at 1–2); however, no additional evidence has been submitted.

question of whether he was presently taking medication under a doctor's order, Plaintiff responded that he was taking Ibuprofen (*id.*). Officer Wells noted that Plaintiff was not carrying any prescribed medication with him (*id.*). Plaintiff's first physical examination, conducted by a licensed practical nurse, occurred on May 7, 2003 (Doc. 55 at 13, Ex B, Medical Data Tracking Log, notes from physical exam dated May 7, 2003, Inmate Medical History). At that time, Plaintiff's history of glaucoma and laser surgery in his left eye were noted, as was the fact that he still had glaucoma and a current prescription for eye drops (*id.*). Also on that day, Plaintiff signed authorizations for medical treatment and for the Jail to obtain and release information regarding his medical condition as necessary (Doc. 55, Ex. B, Authorization to Obtain/Release Medical Information, Authorization for Medical Treatment). Plaintiff's signature does not appear on a document authorizing the Jail to provide him with medication, and Plaintiff states he never saw or signed this document (*see* Doc. 55, Ex. B, Inmate Medication; Doc. 70 at 61). On May 8, 2003, Plaintiff signed a document certifying that he refused to comply with recommendations of the physician and medical staff regarding treatment of his glaucoma, stating, "This fascility [sic] does not have the ability to measure my optic pressure nor treat me and I do not desire to waste thier [sic] time or my money. Thank you anyway." (Doc. 55, Ex. B). The document is also signed by a witness (*id.*).

Plaintiff's medical records show that he presented to Dr. Hart on June 19, 2003, with multiple medical complaints (Doc. 55, Ex. B, Medical Progress Note, transcribed notes from examination, Physician's Orders). Plaintiff reported a history of glaucoma and surgery on his left eye (*id.*, transcribed notes). Plaintiff stated he had been out of his medication that he had been instructed to take since January, and his eyes were becoming painful (*id.*). Dr. Hart ordered that Plaintiff's prescription for Cosopt drops be restarted "ASAP," but that staff should confirm the type and dosage with the Harrison Eye Institute or Walgreens pharmacy (Doc. 55, Ex. B, Physician's Orders). The medical records show that on June 20, 2003, Plaintiff was given the Cosopt drops, to administer one drop in the left eye twice daily (Doc. 55, Ex. B, Medication Record for June, July, September–December, 2003). On August 1, 2003, medical staff requested Plaintiff's medical records from the Mullis Eye Institute (formerly Hamilton Eye Institute) (Doc. 55, Ex. B, Facsimile Cover Sheet and Fax History Report), and the Institute provided the records the same day (*id.*, Ex. B, Transmittal Cover Sheet with eight pages attached and Fax History Report). Those records show

that on August 16, 2002, Plaintiff was prescribed Cosopt drops for his left eye (Ex. B, medical records from Mullis Eye Institute); Plaintiff had laser surgery on his left eye on August 28, 2002 (*id.*); and on September 5, 2002, use of Pilocarpine drops in the left eye was discontinued (*id.*).  The last entry states that Plaintiff would contact the Institute when he wished to schedule laser surgery for his right eye (*id.*).  Plaintiff's medical records indicate that on August 7, 2003, Dr. Hart ordered staff to schedule an appointment for Plaintiff with a specialist (Ex. B, Physician's Orders).  Dr. Hart's order for that date also includes the notation, "Pilocarpine Opth. gets from home" (*id.*).  An appointment with an opthalmologist was scheduled for August 21, 2003 (*id.*).  On that date, Plaintiff was examined by Dr. Karen Stein of the Mullis Eye Institute (Ex. B, Consult Provider Data Form).  She determined that Plaintiff suffered "anatomically narrow angles" in both eyes and a risk of angle closure glaucoma in the right eye (*id.*).  Dr. Stein recommended the following:  (1) Plaintiff receive prescription bifocals, (2) Plaintiff continue Pilocarpine drops in the right eye, and (3) Plaintiff receive laser surgery in his right eye (*id.*).  The next day, on August 22, 2003, a member of the medical staff spoke with Dr. Stein regarding the immediacy of the recommended laser surgery (Ex. B, Medical Progress Note).  Dr. Stein stated that the surgery was not required as long as Plaintiff used the Pilocarpine drops (*id.*).  Plaintiff's records indicate that the Pilocarpine drops were prescribed on August 29, 2003, and he was to administer one drop in his right eye three times daily (Ex. B, Medication Record for October of 2003).  The records for October of 2003 indicate that Plaintiff was in possession of the drops through December of 2003 (*id.*, Medication Record for October–December of 2003).  Plaintiff's records show that on November 4, 2003, Dr. Kennedy noted that Plaintiff stated he was not interested in pursuing laser surgery in his right eye at that time (*id.*).  Dr. Kennedy continued the prescription for Pilocarpine drops for Plaintiff's right eye, to be self-administered by Plaintiff (*id.*).

In response to the special reports, Plaintiff submitted a statement of facts, memorandum, and affidavit which essentially re-state the facts set forth in his Fourth Amended Complaint (Doc. 70 at 1–49, Ex. P).  In the statement of facts, Plaintiff admits that although laser surgery for his right eye was recommended months prior to his arrest, he did not schedule the surgery due to personal problems (Doc. 70 at 2).  Plaintiff states he was prescribed Cosopt eye drops for his left eye on August 28, 2002, after the laser surgery on that eye, and he purchased those drops from the

Walgreens pharmacy (*id.* at 2–3).  Plaintiff states he was previously prescribed Pilocarpine drops for both eyes, and these drops were supplied by the Hamilton Eye Institute (*id.*).  Plaintiff admits that upon his first examination by Dr. Hart on June 19, 2003, he could recall only the name "Cosoft," which Dr. Hart correctly interpreted as Cosopt (*id.* at 4).  Plaintiff states he could not recall the name of the other drops, and the only information he provided to Dr. Hart was the color of the cap and the location of the doctor's office (*id.*).  Plaintiff contests the validity of the medical records to the extent they purport to state that medication was administered by nurses on the dates and times indicated (*id.* at 8).  He states that the medical note by Dr. Kennedy on November 4, 2003, is "completely fabricated" because he was never seen by Dr. Kennedy and he never signed a form to discontinue the Cosopt (*id.* at 10).  Plaintiff denies that he ever stated he was not interested in pursuing laser surgery for his right eye (*id.*).  Plaintiff additionally submitted a purported affidavit from Andrew Amicon, a registered nurse and critical care nurse for over thirty years, who read Plaintiff's allegations, reviewed his medical records, witnessed Plaintiff's "ongoing disabilities," and is familiar with professional standards (Doc. 70, Ex. M).[2]  Mr. Amicon provides the following opinions:  (1) Plaintiff's injury was exacerbated by a breach of the prevailing standard of care by Plaintiff's health care providers, including Dr. Hart; (2) Plaintiff suffered "catastrophic" and permanent injury due to "indifference and/or negligent affirmative medical intervention" of Plaintiff's health care providers; (3) Dr. Hart was "indifferent and/or negligent" by failing to order a consultation with an opthalmologist sooner than August of 2003; and (4) Dr. Hart was "indifferent and/or negligent" by failing to order Pilocarpine and Cosopt eye drops to treat Plaintiff's glaucoma (*id.*).

As to Defendant Bolton, Plaintiff disputes Bolton's statement that he did not shoot a laser device at Plaintiff, and states that Bolton stood in the open door of the pod when he shot Plaintiff with the laser (*id.* at 21).  Plaintiff also submitted an affidavit of Guy Folta, a former inmate at the

---

[2]The purported affidavit of Andrew Amicon arguably suffers from a formal defect in that although Mr. Amicon states he "hereby swear[s] that the following statement is true and correct and made of my own free will, and from my own personal knowledge," there is no indication that the statement was sworn to before a person authorized by law to administer oaths, and the declaration was not signed under penalty of perjury.  However, neither Defendant filed a motion to strike or otherwise objected to consideration of Mr. Amicon's declaration; therefore, any formal defects are deemed waived.  *See* <u>Auto Drive-Away Co. of Hialeah, Inc. v. I.C.C.</u>, 360 F.2d 446, 449 (11th Cir. 1966) (citations omitted).

Jail, who states that he witnessed Defendant Bolton and other officers shoot lasers at inmates (Doc. 70, Ex. M).  Additionally, Plaintiff contends that the memorandum of Captain Morasch may not be considered on summary judgment because it is not signed, notarized, or verified (Doc. 70 at 172).

With regard to the exhaustion issue, Plaintiff states that in 2003, when the events underlying this lawsuit occurred, the only grievance procedure available to inmates was the filing of initial grievances (Doc. 70 at 19, Ex. P).  Plaintiff states there were no other forms or procedures made known to or provided to inmates at that time (*id.*).

Plaintiff also submitted newspaper articles, some of which are recopied in Plaintiff's handwriting (Doc. 70, Ex. K at 114–17, Exs. O, Q, S–U), copies of medical records submitted by Defendants with Plaintiff's notes written on some of them (*id.*, Exs. A, C–I), handwritten definitions of medical terms and conditions purportedly recopied from encyclopedias and other sources (*id.*, Ex. K), and grievances (*id.*, Ex. L).

III.    LEGAL STANDARDS

A.    Summary Judgment Standard

In order to prevail on their motion for summary judgment, Defendants must show that Plaintiff has no evidence to support his case or present affirmative evidence that Plaintiff will be unable to prove his case at trial.  Celotex Corp. v. Catrett, 477 U.S. 317, 322–23, 106 S. Ct. 2548, 2553–54, 91 L. Ed. 2d 265 (1986).  If Defendants successfully negate an essential element of Plaintiff's case, the burden shifts to Plaintiff to come forward with evidentiary material demonstrating a genuine issue of fact for trial.  *Id.*  The "mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).  "[T]he substantive law will identify which facts are material" and which are irrelevant.  Anderson, 477 U.S. at 248.  An issue of fact is material if it is a legal element of the claim under the applicable substantive law which might affect the outcome of the case.  *See id.*; *accord* Tipton v. Bergrohr GMBH-Siegen, 965 F.2d 994, 998 (11th Cir. 1992).

When assessing the sufficiency of the evidence in favor of the nonmoving party, the court must view all the evidence, and all factual inferences reasonably drawn from the evidence, "in the

light most favorable to the non-moving party." Hairston v. Gainesville Sun Publ'g Co., 9 F.3d 913, 918 (11th Cir. 1993). "If reasonable minds could differ on the inferences arising from undisputed facts, then a court should deny summary judgment." Miranda v. B & B Cash Grocery Store, Inc., 975 F.2d 1518, 1534 (11th Cir. 1992) (citing Mercantile Bank & Trust Co. v. Fidelity and Deposit Co., 750 F.2d 838, 841 (11th Cir. 1985)). The court is not obliged, however, to deny summary judgment for the moving party when the evidence favoring the nonmoving party is "merely colorable or is not significantly probative." Anderson, 477 U.S. at 249–50. "A mere 'scintilla' of evidence supporting the . . . [nonmoving] party's position will not suffice" to demonstrate a material issue of genuine fact that precludes summary judgment. Walker v. Darby, 911 F.2d 1573, 1577 (11th Cir. 1990) (quoting Anderson, 477 U.S. at 252, 106 S. Ct. at 2512). Plaintiff must show more than the existence of a "metaphysical doubt" regarding the material facts, Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L. Ed. 2d 538 (1986), and a "scintilla" of evidence or conclusory allegations is insufficient. Celotex Corp., 477 U. S. at 324 (quoting Fed. R. Civ. P. 56(e)). Plaintiff must either point to evidence in the record or present additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency. Id.; Owen v. Wille, 117 F.3d 1235, 1236 (11th Cir. 1997); Hammer v. Slater, 20 F.3d 1137 (11th Cir. 1994). The Eleventh Circuit has consistently held that conclusory allegations without specific supporting facts have no probative value, and are legally insufficient to defeat summary judgment. See Leigh v. Warner Bros., Inc., 212 F.3d 1210, 1217 (11th Cir. 2000); Sammons v. Taylor, 967 F.2d 1533, 1544–45 & n.5 (11th Cir. 1992).

     B.     Exhaustion of Administrative Remedies

     The Prison Litigation Reform Act, 42 U.S.C. § 1997e (PLRA), provides: "No action shall be brought with respect to prison conditions under [42 U.S.C. § 1983], or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." The Supreme Court has recently stated that this "invigorated" exhaustion requirement is the "centerpiece" of the PLRA. Woodford v. Ngo, 548 U.S. 81, 126 S. Ct. 2378, 2382, 165 L. Ed. 2d 368 (2006). The exhaustion requirement helps to ensure that the "flood of nonmeritorious claims does not submerge and effectively preclude consideration of the allegations with merit." Jones v. Bock, 549 U.S. 199, 127 S. Ct. 910, 914, 166 L. Ed. 2d 798

(2007).  It also "attempts to eliminate unwarranted federal-court interference with the administration of prisons, and thus seeks to 'affor[d] corrections officials time and opportunity to address complaints internally before allowing the initiation of a federal case.'" Woodford, 126 S. Ct. at 2387 (quoting Porter v. Nussle, 534 U.S. 516, 525, 122 S. Ct. 983, 152 L. Ed. 2d 12 (2002)) (footnote omitted).   The exhaustion requirement is mandatory, and there is no discretion to waive it. Woodford, 126 S. Ct. at 2382; Alexander v. Hawk, 159 F.3d 1321, 1324–26 (11th Cir. 1998). Additionally, the PLRA exhaustion requirement requires proper exhaustion, which means that a prisoner must comply with the procedural rules of the institution's grievance system.  Woodford, 126 S. Ct. at 2387–88.

However, prisoners are required to exhaust only administrative remedies that are "available." 42 U.S.C. § 1997e.  Even though remedies may be in place, they are not "available" if they are "remedies or requirements for remedies that an inmate does not know about and cannot discover through reasonable effort by the time they are needed."  See Goebert v. Lee County, 510 F.3d 1312, 1322 (11th Cir. 2007); see also Brown v. Sikes, 212 F.3d 1205, 1207–08 (11th Cir. 2000) (holding that a prisoner must "provide as much relevant information as he reasonably can in the administrative grievance process, . . . [but] a grievance procedure that requires a prisoner to provide information he does not have and cannot reasonably obtain is not a remedy that is 'available' to the prisoner"); Hemphill v. New York, 380 F.3d 680, 688 (2d Cir. 2004) ("The test for deciding whether the ordinary grievance procedures were available must be an objective one:  that is, would a similarly situated individual of ordinary firmness have deemed them available." (internal quotation marks omitted)); Miller v. Norris, 247 F.3d 736, 740 (8th Cir. 2001) ("[A] remedy that prison officials prevent a prisoner from 'utiliz[ing]' is not an 'available' remedy under § 1997e(a) . . . ." (second alteration in original)).  As the Eleventh Circuit noted in Goebert,

> [if Jail officials keep an inmate] in the dark about the path she was required to follow, the defendants should not benefit from her inability to find her way.
>         . . . .
> If we allowed jails and prisons to play hide-and-seek with administrative remedies, they could keep all remedies under wraps until after a lawsuit is filed and then uncover them and proclaim that the remedies were available all along.

510 F.3d at 1323.

Additionally, some courts have held that purported requirements of prison grievance procedures, even if they are set forth in a written handbook or guidelines, are not "available administrative remedies" for PLRA purposes if the written procedures are not mandatory, exclusive, and expeditious.  *See* In re Bayside Prison Litigation, 190 F. Supp. 2d 755, 771–72 (D. N.J. 2002) (complaint procedure described in handbook could not be considered an administrative remedy for purposes of PLRA's exhaustion requirement where "handbook creates the clear impression that the use of the [] grievance procedure is optional not mandatory," and the described grievance process is not expeditious "in that it did not require administrators to respond to complaints . . . in any specific time period."); Martin v. Sizemore, No. Civ.A. 05-CV-105-KKC, 2005 WL 1491210, at *2 (E.D. Ky. June 22, 2005) (administrative remedies were not "available" to plaintiff because policy set forth in inmate handbook was not a PLRA-compliant mandatory administrative remedy, based upon the following: (1) it merely suggested that inmate "may" file grievance, (2) it was not exclusive in that nowhere did it indicate that it provided the sole method inmate may utilize in registering a grievance, (3) it made no reference to the PLRA, (4) it did not state that grievance was mandatory for any purpose, (5) it was misleadingly entitled "Complaints" as opposed to "Grievance" or "Administrative Remedy," and (6) it stated that only "legitimate" complaints would be answered).

The Eleventh Circuit has not decided, as some of its sister circuits have, how much less than perfect compliance with administrative remedies is enough to constitute exhaustion, or what, if any, exceptions to the exhaustion requirement exist.  *See* Dole v. Chandler, 438 F.3d 804, 811 (7th Cir. 2006) (holding that a prisoner properly exhausted his administrative remedies when the jail lost his timely grievance form but the prisoner did not attempt to re-file his complaint); Hemphill, 380 F.3d at 689 (recognizing "special circumstances" that permit less than perfect compliance, including reasonable but incorrect readings of the administrative procedures, and recognizing estoppel and failure to raise or preserve the defense as exceptions to the exhaustion requirement); Spruill v. Gillis, 372 F.3d 218, 232 (3d Cir. 2004) (holding that substantial compliance with administrative procedures will exhaust them under the PLRA); Strong v. David, 297 F.3d 646, 650 (7th Cir. 2002) (if applicable prison or jail regulations do not prescribe any particular content to inmate grievances, "a grievance suffices if it alerts the prison to the nature of the wrong for which redress is sought. As in a notice pleading system, the grievant need not lay out the facts, articulate legal theories, or

demand particular relief.  All the grievance need do is object intelligibly to some asserted shortcoming."); *see also* Woodford, 126 S. Ct. at 2393 (Breyer, J., concurring) (recognizing that § 1997e(a) requires proper exhaustion, but suggesting that traditional exceptions to administrative exhaustion also apply to it).

      C.      Eighth Amendment Standard for Medical Claims

      In his Fourth Amended Complaint, Plaintiff claims that Dr. Hart was deliberately indifferent to his medical needs, in violation of the Eighth Amendment.  It is well settled that the government has a constitutional duty to provide minimally adequate medical care to prisoners.  Harris v. Thigpen, 941 F.2d 1495, 1504 (11th Cir. 1991).  Medical treatment violates the Eighth Amendment "only when it is 'so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness.'" *Id.* at 1505 (citing Rogers v. Evans, 792 F.2d 1052, 1058 (11th Cir. 1986)).  Incidents of mere negligence or malpractice do not rise to the level of constitutional violations. *Id.* (citing Estelle v. Gamble, 429 U.S. 97, 106, 97 S. Ct. 285, 50 L. Ed. 2d 251 (1976)).

      Stating an Eighth Amendment claim of denial of adequate medical care requires satisfying both an objective and subjective component.  Taylor v. Adams, 221 F.3d 1254, 1257 (11th Cir. 2000).  First, there must be conduct by prison officials which, objectively speaking, is "sufficiently serious" to constitute a deprivation "'denying the minimal civilized measure of life's necessities.'" *Id.* (quoting Wilson v. Seiter, 501 U.S. 294, 298, 111 S. Ct. 2321, 115 L. Ed. 2d 271 (1991) (internal quotation omitted)).  Second, the prison officials must possess a subjective intent to use the medical deprivation as a means of punishment. *Id.* (citations omitted).

      Both the objective and subjective components encompass two subsidiary requirements. Taylor, 221 F.3d at 1258.  As to the objective prong, an objectively serious deprivation requires showing an objectively "serious medical need."  Estelle, 429 U.S. at 104.  A serious medical need is "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention."  Hill v. DeKalb Regional Youth Detention Center, 40 F.3d 1176, 1186 (11th Cir. 1994), *abrogated on other grounds by* Hope v. Pelzer, 536 U.S. 730, 122 S. Ct. 2508, 153 L. Ed. 2d 666 (2002); *see* Farmer v. Brennan, 511 U.S. 825, 834, 114 S. Ct. 1970, 128 L. Ed. 2d 811 (1994) (serious medical need is one that, if

left unattended, "pos[es] a substantial risk of serious harm.").  In addition, an objectively serious deprivation requires showing the response made by Defendants to that need was so deficient as to constitute "an unnecessary and wanton infliction of pain." Estelle, 429 U.S. at 105–06 (internal quotation marks omitted); see Taylor, 221 F.3d at 1257; see also Adams v. Poag, 61 F.3d 1537, 1543–44 (11th Cir. 1995).

 To show the required subjective intent to punish, Plaintiff must demonstrate that Defendants acted with an attitude of "deliberate indifference." Estelle, 429 U.S. at 105. "Deliberate indifference has three components: (1) subjective knowledge of a risk of serious harm; (2) disregard of that risk; (3) by conduct that is more than mere negligence." Farrow v. West, 320 F.3d 1235, 1245–46 (11th Cir. 2003) (citing McElligott v. Foley, 182 F.3d 1248, 1255 (11th Cir. 1999) and Taylor, 221 F.3d at 1258 (stating that defendant must have subjective awareness of an "objectively serious need" and that his response must constitute "an objectively insufficient response to that need")).

 A complete denial of readily available treatment for a serious medical condition constitutes deliberate indifference. Harris v. Coweta County, 21 F.3d 388, 393 (11th Cir. 1994). However, where the inmate has received medical treatment, and the dispute is over the adequacy of that treatment, courts should be reluctant to question the accuracy or appropriateness of the medical judgments that were made. Harris, 941 F.2d at 1507 (quoting Waldrop v. Evans, 871 F.2d 1030, 1035 (11th Cir. 1989)).  To do otherwise would be "to constitutionalize claims that sound in tort law." Hamm v. DeKalb County, 774 F.2d 1567, 1575 (11th Cir. 1985) (quotation omitted).

 D. Eighth Amendment Standard for Excessive Force Claim

 Plaintiff also alleges that Defendant Bolton used excessive force by pointing a laser-targeting device in Plaintiff's eye.  When claims involve the use of excessive force, the Eighth Amendment standard is different.  First, regarding the objective component, a prisoner need not show that such force caused an "extreme deprivation" or "serious" or "significant" pain or injury to establish a cause of action. Hudson v. McMillian, 503 U.S. 1, 8–9, 112 S. Ct. 995, 999–1000, 117 L. Ed. 2d 156 (1992).  All that is necessary is proof of more than de minimis pain or injury. Id.  Second, the subjective component requires consideration of "whether force was applied in a good faith effort to maintain or restore discipline or inflicted maliciously or sadistically for the very purpose of causing

harm." <u>Hudson</u>, 503 U.S. at 112 (quoting <u>Whitley v. Albers</u>, 475 U.S. 312, 320–21, 106 S. Ct. 1078, 1085, 89 L. Ed. 2d 251 (1986)).  The Supreme Court has directed that several factors should be balanced in determining whether prison officials acted maliciously and sadistically.  These factors, set out originally in <u>Whitley</u>, 475 U.S. 312, include:  (1) the need for application of force, (2) the relationship between that need and the amount of force used, (3) the threat "reasonably perceived by the responsible officials," and (4) "any efforts made to temper the severity of a forceful response."  <u>Hudson</u>, 503 U.S. at 7 (citations omitted).

IV.    CONCLUSIONS OF LAW REGARDING MATERIAL FACTS

          Initially, the court notes that some of the evidence submitted by Plaintiff in his response to the summary judgment motions, specifically, newspaper articles and Plaintiff's handwritten definitions of medical terms and conditions purportedly recopied from encyclopedias and other sources, may not be considered on summary judgment.  The general rule regarding the consideration of hearsay statements included in verified pleadings, affidavits, documents, and other materials submitted pursuant to Rule 56 is that inadmissible hearsay, meaning out-of-court statements presented for the purpose of establishing the truth of the content of the statement and that does not fall within an exception to the hearsay rule, may not be considered on a motion for summary judgment.  <u>Macuba v. Deboer</u>, 193 F.3d 1316, 1322 (11th Cir. 1999) (citation omitted).  The court may consider a hearsay statement if the statement could be "reduced to admissible evidence at trial" or "reduced to admissible form."  <u>Id.</u> at 1323 (quoting <u>Wright v. Southland Corp.</u>, 187 F.3d 1287 (11th Cir. 1999); <u>Pritchard v. Southern Co. Servs.</u>, 92 F.3d 1130, 1135 (11th Cir. 1996); <u>McMillian v. Johnson</u>, 88 F.3d 1573, 1584–85 (11th Cir. 1996)).  Thus,

> the out-of-court statement made to the witness (the Rule 56(c) affiant or the deposition deponent) must be admissible at trial for some purpose.  For example, the statement might be admissible because it falls within an exception to the hearsay rule, [FN14] or does not constitute hearsay at all (because it is not offered to prove the truth of the matter asserted, [FN15] or is used solely for impeachment purposes (and not as substantive evidence). [FN16]

<u>Id.</u> at 1323–24 (footnotes omitted).

          In addressing the admissibility of documents in support of motions seeking or opposing summary judgment, courts routinely hold that materials such as newspapers and periodicals cannot

be considered when resolving a motion for summary judgment.[3]  In the instant case, the newspaper articles submitted by Plaintiff and the handwritten definitions of medical terms and conditions purportedly recopied from encyclopedias and other sources do not constitute materials which may be considered on a motion for summary judgment because they contain hearsay for which no exception exists.   Therefore, these materials will not be considered on summary judgment. Additionally, the opinion of Mr. Amicon that Dr. Hart was "indifferent and/or negligent" in his provision of medical care is a legal conclusion; therefore, it carries no weight in determining whether genuine issues of material fact exist and whether Dr. Hart is entitled to judgment as a matter of law.

Additionally, Plaintiff contends that the memorandum from Captain C. Morasch to Paul Lawson, dated April 5, 2005, submitted by Defendant Bolton in support of his summary judgment motion (*see* Doc. 52, Ex. A) may not be considered on summary judgment because it is not signed, notarized, or verified.  The undersigned concludes that analysis of whether or not the memorandum falls within an exception to the hearsay rule or does not constitute hearsay at all need not be decided because, as discussed *infra*, even if the court considered the memorandum in ruling on Officer Bolton's summary judgment motion, the motion should be denied.

A.      Exhaustion

Both Defendants contend Plaintiff failed to exhaust his administrative remedies with respect to his claims because he failed to appeal his initial grievances to the next level of administrative review.  As additional grounds for an exhaustion defense, Dr. Hart argues that Plaintiff failed to comply with the grievance policy because his grievances were not sufficiently specific to constitute an initial grievance with regard to his claim that Dr. Hart denied him proper medical care, and the

---

[3]*See, e.g.,* Smith v. Village of Garden City, 592 F. Supp. 637 (E.D.N.Y. 1984) (a newspaper article describing statements made by a police department that it viewed all blacks entering the city as suspicious and that it had a policy of stopping suspicious people and running their names through a computer to determine if they were wanted on outstanding arrest warrants could not be considered on a motion for summary judgment); De La Cruz v. DuFresne, 533 F. Supp. 145 (D.C. Nev. 1982) (copies of newspaper articles attached to memoranda of points and authorities were hearsay and could not be considered on motion for summary judgment); U.S. v. An Article of Food Consisting of Cartons of Swordfish, 395 F. Supp. 1184 (S.D.N.Y. 1975) (articles which had appeared in Harvard Law Review, New York Times, the Daily News, and a medical publication, none of which were based upon personal knowledge of any matters in dispute and none of which were sworn, were insufficient to raise an issue which would defeat summary judgment.)

grievances were not filed within seven days of the date of any specific incident.  Defendant Bolton

argues that Plaintiff's initial grievance regarding use of the laser device was untimely because it was

filed more than one year after the incident, and the grievance policy requires that the grievance be

filed within seven days of the incident.   In support of their exhaustion argument, Defendants

submitted a copy of the written policy of the Jail concerning the inmate grievance procedure (Doc.

52, Ex. B; Doc. 55, Ex. A), and Defendant Bolton additionally submitted a copy of an affidavit of

Deputy Director P. Lawson filed in <u>Horn v. Wallace, et al.</u>, Case No. 3:06cv108/LAC/EMT (Doc.

52, Exs. B, C).  The policy submitted by Defendants states that its effective date is August 24, 2006,

and it rescinds the policy implemented on October 1, 2005 (Doc. 52, Ex. B).  In his affidavit, Deputy

Director Lawson states that the written policy that was effective after October of 2005 was the same

policy with the same provisions as was effective during the time of the incidents alleged by Plaintiff

Horn in the Third Amended Complaint filed in Case No. 3:06cv108/LAC/EMT, which was June of

2005 (*see* Doc. 52, Lawson Aff. ¶ 8; *see also*   <u>Horn v. Wallace, et al.</u>, Case No.

3:06cv108/LAC/EMT, Doc. 37).  Deputy Director Lawson additionally states that although not

directly stated in the written policy, inmates are told that they may appeal to the next higher level

of administrative review if they fail to receive a response to a grievance when they believe a

response is warranted (*see* Doc. 52, Lawson Aff. ¶ 12).  Although Officer Bolton states that the

Lawson Affidavit will be substituted with another affidavit, presumably to include facts relevant to

this particular case (*see* Doc. 52 at 9), no such substitution was made.

Plaintiff contends that in 2003, when the events underlying this lawsuit occurred, the only

grievance procedure available to inmates was the filing of initial grievances (Doc. 70 at 19, Ex. P).

Plaintiff states there were no other forms or procedures made known to or provided to inmates at that

time (*id.*).  Plaintiff submitted copies of numerous initial grievances concerning his eye condition

(Doc. 70, Ex. L).  A grievance dated August 3, 2003, was directed to the medical department marked

"urgent" (*id.* at 134).   In that grievance, Plaintiff stated that he had been complaining about his

glaucoma since he arrived at the Jail, he told "the Doctor" the identity of his eye surgeon, and he had

vision when he arrived at the Jail but was almost blind at the time of writing the grievance (*id.*).

Plaintiff stated that he had been provided the wrong eye drops, he had to wear two pairs of glasses

to write, and he needed surgery (*id.*).  The grievance indicates it was received by a staff member the

same day (*id.*).  In another grievance dated August 7, 2003, directed to "?," Plaintiff stated that he had been there 100 days, had not been seen by a specialist, had severe pain in his right eye, and was blind in that eye (*id.*).  On August 10, 2003, Plaintiff addressed a grievance to Dr. Hart stating he had repeatedly requested that his eye doctor, who Plaintiff identified as the Harrison Eye Institute, be contacted, that he was overdue for eye surgery, that he was going blind in his right eye, and that he could not get a response from anyone (*id.* at 135).  On August 11, 2003, Plaintiff addressed a grievance to the medical department stating that every shift of every day he had inquired as to whether Dr. Hart had contacted the Harrison Eye Institute about scheduling surgery, and he expressed that he was in severe pain (*id.*).  On August 14, 2003, Plaintiff addressed a grievance to "Medical? Anybody? Lt. Foley?," complaining that he still received no response regarding eye surgery even though he spoke to every nurse and sent direct letters to Dr. Hart with the nurses, and he stated he was going blind (*id.* at 136).  On August 28, 2003, Plaintiff addressed a grievance to the medical department stating that he needed his new drops because his drops had expired more than a year ago (*id.*).  Plaintiff additionally inquired as to whether he had been given a prescription for glasses that could be filled or whether he needed to see an optometrist (*id.* at 136–37).  The grievance was returned to Plaintiff with the response, "Addressed" (*id.* at 137).  On November 15, 2003, Plaintiff completed a grievance form stating he was using three pair of magnifying glasses to be able to see, and he requested prescription glasses (*id.* at 139).

With regard to the alleged use of the laser by Office Bolton, the only grievance submitted by Plaintiff relating to the use of a laser device was a grievance submitted in January of 2005, when Plaintiff was returned to the Jail from the FDOC for a court appearance (Doc. 70, Ex. L at 146).  In that grievance, Plaintiff stated that while he was incarcerated at the Jail from May 1, 2003 through January 28, 2004, "the officers" repeatedly shot laser beams at inmates, and he was shot in the right eye, rendering him blind in that eye (*id.*).

Viewing the facts in the light most favorable to Plaintiff, a reasonable jury could conclude that Plaintiff's grievances were sufficiently specific to constitute an initial grievance with regard to his claim that Dr. Hart denied him proper medical care with respect to his glaucoma.  The next issue is whether Plaintiff's grievances concerning both his medical care and the use of the laser were timely, and whether Plaintiff was required to proceed to a higher level of administrative review.  The

parties dispute whether the grievance procedure in place in 2003 required an inmate to file a grievance within seven days of the incident or action which was the subject of the grievance, and whether the grievance policy in place at that time required an inmate to appeal the denial of an initial grievance to the next level of administrative review.  Plaintiff states that in 2003, the only grievance procedure available to inmates was the filing of initial grievances, and there were no other forms or procedures made known to or provided to inmates at that time (*see* Doc. 22 at 4; Doc. 70 at 19, Ex. P).  Defendants submitted a written grievance policy effective August 24, 2006, and an affidavit stating that the same policies and procedures were in force earlier than that date, even as far back as mid-2005.  The disputed facts concerning the grievance requirements in place in 2003 are critical to the exhaustion defense.  Construing the facts in the light most favorable to Plaintiff, a reasonable jury could conclude that Plaintiff complied with the grievance procedure that was available at the time of the events underlying his claims.  Therefore, summary judgment for Defendants is inappropriate as to the exhaustion issue.

     B.      Eighth Amendment Claims Against Dr. Hart

     Plaintiff claims that the following conduct of Dr. Hart constituted deliberate indifference to his medical needs:  (1) delay in scheduling an appointment with an opthalmologist to examine and monitor his glaucoma; (2) delay in providing Cosopt drops for his left eye and Pilocarpine drops for his right eye, for the period April 30 to August 28, 2003; (3) failure to provide eye surgery for his right eye, and (4) failure to provide prescription glasses.  Dr. Hart does not dispute that Plaintiff's glaucoma qualified as a serious medical need for purposes of the Eighth Amendment, rather he contends that the record is devoid of evidence to support Plaintiff's allegations that Dr. Hart was deliberately indifferent to Plaintiff's condition.

     As previously discussed, in order to satisfy the deliberate indifference component, the "Plaintiff must prove three things:  (1) subjective knowledge of a risk of serious harm; (2) disregard of that risk; (3) by conduct that is more than [gross] negligence." Bozeman v. Orum, 422 F.3d 1265, 1272 (11th Cir. 2005) (per curium) (second alteration in original) (internal quotation marks omitted). With regard to the subjective knowledge component, the United States Supreme Court held in Farmer that:  "Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial

evidence." Farmer, 511 U.S. at 842.  Disregard of the risk is also a question of fact that can be shown by standard methods. Id. at 846.  The meaning of the third element, was recently discussed by the Eleventh Circuit in Goebert v. Lee County:

> The meaning of "more than gross negligence" is not self-evident but past decisions have developed the concept.  In cases that turn on the delay in providing medical care, rather than the type of medical care provided, we have set out some factors to guide our analysis.  Where the prisoner has suffered increased physical injury due to the delay, we have consistently considered:  (1) the seriousness of the medical need; (2) whether the delay worsened the medical condition; and (3) the reason for the delay.

510 F.3d at 1327 (citing Hill, 40 F.3d at 1189).  In Farmer, the Supreme Court identified three ways in which prison officials might avoid liability.  Officials might show:  (1) "that they did not know of the underlying facts indicating a sufficiently substantial danger and that they were therefore unaware of a danger"; (2) that "they knew the underlying facts but believed (albeit unsoundly) that the risk to which the facts gave rise was insubstantial or nonexistent"; or (3) that "they responded reasonably to the risk, even if the harm ultimately was not averted."  511 U.S. at 844.

The final requirement for a deliberate indifference claim is that a defendant have a causal connection to the constitutional harm.  Goebert, 510 F.3d at 1327 (citing Cottone, 326 F.3d at 1360).  Causation, of course, can be shown by personal participation in the constitutional violation. Zatler v. Wainwright, 802 F.2d 397, 401 (11th Cir.1986) (per curiam).

In the instant case, there appears to be little dispute as to the following:  (1) Plaintiff's medical records dated May 7, 2003, indicated that he possessed reading glasses; (2) on May 8, 2003, Plaintiff signed a form declining medical treatment for his glaucoma because he did not believe that the Jail had the ability to monitor or treat the disease (see Doc. 55, Ex. B; see also Doc. 22, Ex. A, Plaintiff's grievance dated 05-19-03); (3) at Plaintiff's first and only examination by Dr. Hart on June 19, 2003, Plaintiff informed Dr. Hart that he had a history of glaucoma, that he had surgery on this left eye, that a doctor had prescribed medication, and that his eyes were becoming painful; (4) Dr. Hart immediately ordered staff to restart a prescription for Cosopt and confirm the type and dosage from Plaintiff's eye specialist or the pharmacy Plaintiff used; (5) a prescription for Cosopt drops for Plaintiff's left eye was in place at the Jail on June 19, 2003; (6) Plaintiff's medical records indicate that the Cosopt drops were given to Plaintiff on June 20, 2003, to administer himself; (7)

on August 7, 2003, Dr. Hart directed staff to schedule an appointment with an opthalmologist; (8) on August 21, 2003, Plaintiff was examined by an opthalmologist, who recommended prescription bi-focals, Pilocarpine drops for the right eye, and laser surgery for the right eye; (9) on August 22, 2003, the day after Plaintiff's appointment with the opthalmologist, a follow-up call was placed by someone on the medical staff to Dr. Stein regarding the immediacy of the recommended laser surgery, and a notation was made in Plaintiff's medical file that Dr. Stein advised that the surgery was not required as long as Plaintiff used the Pilocarpine drops; and (10) a prescription for Pilocarpine drops for Plaintiff's right eye was in place at the Jail on August 29, 2003.

Additionally, Dr. Hart has not disputed the allegations in Plaintiff's Fourth Amended Complaint that during Dr. Hart's examination of Plaintiff on June 19, 2003, Plaintiff informed Dr. Hart that his eye doctor had prescribed two types of eye drops and recommended laser surgery for Plaintiff's right eye.  Dr. Hart has also not disputed that Plaintiff filed the grievances attached to his Fourth Amended Complaint, which include the following:  (1) on August 3, 2003, Plaintiff submitted a grievance to the medical department marked "URGENT" stating that he had been complaining constantly about his glaucoma since he arrived at the Jail, he had identified his eye specialist to "the Doctor," he was now almost blind in his right eye, he needed surgery months ago, he had to wear two pairs of glasses to enable him to see, and he was not receiving the appropriate eye drops; (2) on August 10, 2003, Plaintiff submitted a grievance to Dr. Hart stating he had repeatedly requested that his eye doctor be contacted, he was "seriously overdue" for eye surgery, he was going blind in his right eye, and no one was responding to him; (3) on August 11, 2003, Plaintiff submitted a grievance to the medical department stating that every day he tried to find out if Dr. Hart had scheduled eye surgery with Plaintiff's eye doctor, and he was in constant pain; (4) on August 14, 2003, Plaintiff submitted a grievance directed to "Medical? Anybody? Lt. Foley?," stating that he had spoken to every nurse, sent letters directed to Dr. Hart with the nurses, and filed numerous grievances regarding his need for surgery, but had received no response, and he was going blind; and (5) on August 28, 2003, Plaintiff submitted a grievance directed to the medical department stating he needed new eye drops because his drops were more than one year expired, and the drops were necessary to avoid eye surgery (*see* Doc. 22, Ex. A at 5–8)

Viewing these facts in the light most favorable to Plaintiff, a jury could conclude that Dr. Hart was aware on June 19, 2003, that Plaintiff suffered from glaucoma, required two types of eye drops, required surgery for his right eye, and was experiencing pain in his eyes.  A jury could also conclude that Dr. Hart was aware that from June 19, 2003 to August 7, 2003, Plaintiff was not receiving treatment for the glaucoma in his right eye.  Dr. Hart has offered no evidence indicating that he did not know of the underlying facts indicating a sufficiently substantial danger to Plaintiff's right eye and was therefore unaware of a danger, that he knew the underlying facts but believed that the risk to which the facts gave rise was insubstantial or nonexistent, or that there was a justification for the delay in providing eye drops for Plaintiff's right eye or examination by an opthalmologist or both.  From these facts, a jury could conclude that Dr. Hart subjectively knew of a risk of serious harm to Plaintiff's right eye by delaying treatment of Plaintiff's glaucoma in his right eye, that he disregarded that risk, and that the delay from June 19 to August 7 was unjustified.

The final requirement is that Plaintiff demonstrate a causal connection between Dr. Hart's conduct and the constitutional harm.  Taking the summary judgment evidence in the light most favorable to Plaintiff, a reasonable jury could conclude that Dr. Hart's delay in providing treatment for Plaintiff's glaucoma in his right eye caused Plaintiff to endure pain and suffering, at the very least.  Therefore, summary judgment on the claims of delay in scheduling an examination by an opthalmologist and providing eye drops for Plaintiff's right eye until August 7, 2003, is not appropriate.

Summary judgment is also not appropriate as to Plaintiff's claim with respect to the deprivation of prescription eyeglasses.  There is no genuine dispute as to the following facts:  (1) Plaintiff's prescription eyeglasses were confiscated by correctional staff when he was booked into the Jail on April 30, 2003; (2) Plaintiff attempted to compensate for his lack of prescription glasses by wearing as many as three pair of "magnifying" glasses, which he supplied himself; (3) an entry in Plaintiff's medical records dated May 7, 2003, indicated that he possessed "reading glasses" (*see* Doc. 70, Ex. C); (4) on August 21, 2003, the opthalmologist recommended prescription bifocals (*see* Doc. 70, Ex. F at 85); (5) an entry in Plaintiff's medical records dated November 4, 2003, by Dr. Kennedy indicated that Plaintiff possessed eyeglasses (*see* Doc. 70, Ex. G); and (6) Plaintiff was transferred from the Jail in January of 2004.

Additionally, Dr. Hart has not disputed that Plaintiff filed the grievances attached to his fourth amended complaint, which include the following: (1) on August 3, 2003, Plaintiff submitted a grievance to the medical department marked "URGENT" stating that he had to wear two pairs of glasses to enable him to see; (2) on August 28, 2003, Plaintiff submitted a grievance directed to the medical department inquiring whether the opthalmologist gave him a new optical prescription that could be filled or whether he needed to see an optometrist; (3) on October 26, 2003, Plaintiff submitted a grievance stating he desperately needed his glasses to read and write, and his eyesight was being destroyed; and (4) on November 15, 2003, Plaintiff submitted a grievance stating he had to use three pairs of magnifying glasses to see, he needed "real" glasses, he had a degenerative eye disease, and he was in pain (*see* Doc. 22, Ex. A at 2, 7, 8, 11).

Viewing these facts in the light most favorable to Plaintiff, a jury could conclude that Dr. Hart was aware that in May of 2003, Plaintiff possessed reading glasses, and in August of 2003, the opthalmologist recommended prescription glasses as part of Plaintiff's course of treatment. Dr. Hart has offered no evidence indicating that he did not know of the opthalmologist's recommendation, that he was aware of the recommendation but believed that the risk to Plaintiff's eye condition was insubstantial or nonexistent, or that there was a justification for the failure to provide prescription glasses or return Plaintiff's prescription glasses to him. From these facts, a jury could conclude that Dr. Hart subjectively knew of a risk of serious harm to Plaintiff's vision by failing to provide the glasses, that he disregarded that risk, and that the failure to provide them was unjustified. Furthermore, taking the summary judgment evidence in the light most favorable to Plaintiff, a reasonable jury could conclude that Dr. Hart's failure to provide prescription glasses caused Plaintiff pain and, possibly, deterioration of his vision. Therefore, summary judgment on the claim of failure to provide prescription glasses is not appropriate.

The undersigned reaches a different conclusion, however, to the extent Plaintiff claims that Dr. Hart deliberately withheld Pilocarpine drops for the period August 7–28, 2003. Dr. Hart's Physician's Order dated August 7, 2003, indicates his awareness that Plaintiff was obtaining Pilocarpine drops from home. Plaintiff does not dispute that in August of 2003, his attorney retrieved Pilocarpine from Plaintiff's home and delivered them to the Jail (*see* Doc. 22, Statement of Facts ¶ 29; Doc. 70 Statement of Facts ¶ 17). Plaintiff states the drops were provided to him three

days later, but they were "expired" (*see* Doc. 22, Statement of Facts ¶ 30; Doc. 70 Statement of Facts ¶ 17).  When Plaintiff filed a grievance on August 28, 2003, stating he needed new eye drops because his drops were more than one year expired (*see* Doc. 22, Ex. A at 7–8; Doc. 70, Ex. L at 136, 137),  Plaintiff's medical records indicate that a prescription for Pilocarpine drops was in place the next day, on August 29, 2003.  Viewing the facts in the light most favorable to Plaintiff, there is no evidence from which a jury could reasonably infer that Dr. Hart was subjectively aware that Plaintiff was without Pilocarpine drops from August 7–28, 2003.  Furthermore, upon Plaintiff's filing the grievance on August 28, stating that his Pilocarpine drops were expired, a new prescription for the drops was in place the next day.  Therefore, summary judgment in favor of Dr. Hart is appropriate on this claim.

Dr. Hart is likewise entitled to summary judgment on Plaintiff's claim that his failure to provide laser surgery for Plaintiff's right eye constituted deliberate indifference to Plaintiff's medical needs.  Dr. Hart has submitted evidence, in the form of Plaintiff's medical records, showing that the day after Plaintiff was examined by an opthalmologist, the opthalmologist indicated that surgery could be delayed if Plaintiff was provided Pilocarpine drops for his right eye.  Dr. Hart reasonably relied on the opthalmologist's opinion.  Viewing the evidence in the light most favorable to Plaintiff, there is no evidence from which a jury could reasonably infer that Dr. Hart was subjectively aware that the provision of eye drops instead of laser surgery for Plaintiff's right eye posed a substantial risk of serious harm to Plaintiff.

Summary judgment in favor of Dr. Hart is also appropriate regarding Plaintiff's claim concerning Dr. Hart's alleged failure to provide Cosopt eye drops for Plaintiff's left eye.  As previously discussed, there is no genuine issue of material fact as to the following:  (1) in May of 2003, Plaintiff declined medical treatment for his glaucoma because he did not believe that the Jail had "the ability" to monitor or treat the disease, (2) in June of 2003, during an examination by Dr. Hart, Plaintiff complained of pain in his eyes, and he informed Dr. Hart of his history of glaucoma, that he had surgery on this left eye, and that a doctor had prescribed medication, which Dr. Hart recognized as Cosopt eye drops; (3) Dr. Hart immediately ordered staff to restart a prescription for Cosopt and confirm the type and dosage from Plaintiff's eye specialist or the pharmacy Plaintiff used; and (4) a prescription for Cosopt drops for Plaintiff's left eye was in place at the Jail on June

19, 2003.  Viewing the facts in the light most favorable to Plaintiff, there is no evidence from which
a jury could reasonably infer that Dr. Hart failed to provide Cosopt drops for Plaintiff's left eye;
therefore, Dr. Hart is entitled to summary judgment on this claim.

      C.     Eighth Amendment Claim Against Officer Bolton

      Plaintiff claims that in August of 2003, Officer Bolton directed a laser at his right eye, which
caused permanent damage to his retina and loss of vision in his right eye.  The parties do not dispute
that Officer Bolton was employed at the Jail during the time referenced in Plaintiff's Fourth
Amended Complaint.  The parties sharply dispute whether Officer Bolton directed the laser at
Plaintiff's eye.  Officer Bolton submitted an affidavit stating that he did not do so (Doc. 54).  In
response, Plaintiff submitted his own affidavit insisting that Officer Bolton aimed the laser at him
(Doc. 70, Ex. P at 170).  Additionally, Plaintiff submitted an affidavit of Guy Folta stating that while
he was incarcerated at the Jail from November of 2003 through February of 2004, he witnessed
several officers, including Officer Bolton, shoot lasers at inmates' faces, including on their foreheads
and between the eyes (Doc. 70, Ex. M).  The disputed fact of whether Officer Bolton directed a laser
at Plaintiff's eye is critical to Plaintiff's Eighth Amendment claim.  Construing the facts in the light
most favorable to Plaintiff, a reasonable jury could conclude that Officer Bolton directed a laser at
Plaintiff's right eye.

      Officer Bolton additionally contends that Plaintiff's medical history is devoid of any
evidence showing that his eye condition is due to anything other than naturally occurring conditions.
Although the medical records from Plaintiff's examination by Dr. Stein on August 21, 2003 do not
indicate any retinal damage, according to Plaintiff's allegations, Bolton shot his eye with the laser
at some time during the month of August (possibly after the examination); therefore, this evidence
does not refute Plaintiff's claim.  Furthermore, Officer Bolton has not disputed Plaintiff's allegations
that upon Plaintiff's transfer to the Florida Department of Corrections, Dr. Tugwell, an optometrist,
observed a "Cheerio shaped" burn on Plaintiff's retina; Dr. Schlofman, a retina specialist, described
Plaintiff's retina as "shot out"; and Dr. Wolchuk, an opthalmologist, also observed damage to
Plaintiff's retina (Doc. 22, Statement of Facts, ¶¶ 39–43).  Although Officer Bolton states in his
special report that he will supplement his report with additional medical records demonstrating that
the damage to Plaintiff's retina was due to naturally occurring conditions, and although the parties

were advised that the deadline for submitting Rule 56 materials was September 11, 2008 (Doc. 65),
Officer Bolton did not submit additional material or seek an extension of time for filing such.  As
previously discussed, on summary judgment, Defendants must show that Plaintiff has no evidence
to support his case or present affirmative evidence that Plaintiff will be unable to prove his case at
trial.  Viewing the facts in the light most favorable to Plaintiff, a reasonable jury could conclude that
Officer Bolton shot Plaintiff's right eye with a laser without any penalogical justification, and this
conduct caused more than de minimus damage to Plaintiff's eye.  Therefore, summary judgment in
favor of Officer Bolton is not appropriate.

> D.      Equal Protection Claim

Plaintiff appears to assert that Defendants discriminated against him by failing to provide
him the same care and protection as other inmates, in violation of the Fourteenth Amendment (*see*
Doc. 22, Statement of Facts ¶¶ 58, 63, Statement of Claims).  He asserts Defendants treated him
"callously" due to the nature of the criminal charge for which he was serving a sentence (*id.*, ¶ 63).
Plaintiff states he was known for his photography, and "[i]t became hillarious [sic] to watch a
photographer go blind" (*id.*).  Plaintiff states he was not afforded the same care and protection
provided to other inmates "due to [his] lifestyle, beliefs and occupational industry involvement at
that time of my life" (*id.*).

The Equal Protection Clause of the Fourteenth Amendment requires the government to treat
similarly situated people alike. City of Cleburne, Tex. v. Cleburne Living Ctr., 473 U.S. 432, 439,
105 S. Ct. 3249, 3254, 87 L. Ed. 2d 313 (1985).  To establish such a claim, a prisoner may allege
that:  "(1) he is similarly situated with other prisoners who received more favorable treatment; and
(2) his discriminatory treatment was based on some constitutionally protected interest, such as race."
Jones v. Ray, 279 F.3d 944, 946–47 (11th Cir. 2001) (internal quotations omitted); Damiano v. Fla.
Parole & Prob. Comm'n, 785 F.2d 929, 932–33 (11th Cir. 1986).  If a suspect classification, such
as race, or a fundamental right is implicated, a court must apply strict scrutiny to that claim. *See*
Johnson v. California, 543 U.S. 499, 506–07, 125 S. Ct. 1141, 1147, 160 L. Ed. 2d 949 (2005)
(holding that strict scrutiny is the appropriate standard of review for racial classifications even in
the prison context).  If the allegations do not implicate a suspect class, then a court may evaluate

only whether there was a rational basis for how the plaintiff was treated.  *See* <u>Village of</u> <u>Willowbrook v. Olech</u>, 528 U.S. 562, 564, 120 S. Ct. 1073, 145 L. Ed.2 d 1060 (2000).

In the instant case, Plaintiff did not explicitly allege the basis for the denial of equal protection, but he did set forth allegations indicating that it was based either on the nature of his criminal charge, or his lifestyle, beliefs, and "occupational industry involvement" at the time of his offense.  None of these are constitutionally protected interests.  Regardless of the possible basis for the alleged denial of equal protection, however, the undersigned concludes that Plaintiff failed to state an equal protection claim because he did not allege facts showing that any similarly situated prisoners received more favorable treatment.  Therefore, he has failed to state an equal protection claim.

V.    CONCLUSION

Upon consideration of Plaintiff's claims and the evidence submitted, the undersigned concludes that the motion for summary judgment filed by Dr. Hart should be granted in part.  The motion should be granted as to Plaintiff's claims concerning Dr. Hart's alleged failure to provide treatment (Cosopt drops) for glaucoma in his left eye, the alleged failure to provide eye drops (Pilocarpine drops) for his right eye after August 7, 2003, and the failure to provide laser surgery for his right eye.  Dr. Hart's motion should be denied as to Plaintiff's claims concerning the delay in providing eye drops (Pilocarpine drops) for his right eye and scheduling a consultation with an opthalmologist until August 7, 2003, and the failure to provide prescription glasses.  As to Officer Bolton, it is the opinion of the undersigned that his motion for summary judgment should be denied. Finally, to the extent Plaintiff asserts an equal protection claim, his claim should be dismissed for failure to state a claim upon which relief may be granted.

Accordingly it is respectfully **RECOMMENDED**:

1.      That Defendant Hart's motion for summary judgment (Docs. 55, 67) be **GRANTED** as to Plaintiff's claims that Dr. Hart failed to provide treatment (Cosopt drops) for glaucoma in his left eye, failed to provide eye drops (Pilocarpine drops) for his right eye after August 7, 2003, and failed to provide laser surgery for his right eye, in violation of the Eighth Amendment.

2.      That Defendant Hart's motion for summary judgment (Docs. 55, 67) be **DENIED** as to Plaintiff's claims that Dr. Hart unreasonably delayed the provision of eye drops (Pilocarpine

drops) for Plaintiff's right eye and scheduling a consultation with an opthalmologist until August 7, 2003, and failed to provide prescription glasses, in violation of the Eighth Amendment.

    3.    That Defendant Bolton's motion for summary judgment (Docs. 52, 66) be **DENIED**.

    4.    That Plaintiff's equal protection claim, to the extent he asserts one, be **DISMISSED** for failure to state a claim upon which relief may be granted.

    At Pensacola, Florida, this 6th day of November 2008.


                            /s/ Elizabeth M. Timothy
                            **ELIZABETH M. TIMOTHY**
                            **UNITED STATES MAGISTRATE JUDGE**



                        **NOTICE TO THE PARTIES**

    **Objections to these proposed findings and recommendations may be filed within ten (10) days after being served a copy thereof.  Any different deadline that may appear on the electronic docket is for the court's internal use only, and does not control.  A copy of objections shall be served upon the magistrate judge and all other parties.  Failure to object may limit the scope of appellate review of factual findings.  *See* 28 U.S.C. § 636; United States v. Roberts, 858 F.2d 698, 701 (11th Cir. 1988).**